WESTERN COAL & MINING COMPANY v. GARNER.

Opinion delivered July 13, 1908.

1. MASTER AND SERVANT—EXPLOSION OF POWDER—ASSUMED RISK.—Where a miner was injured by explosion of powder located for distribution under electric wires, the explosion being caused by a spark of fire either from some one's pipe or from the wires forming a short circuit, the risk in either event was one assumed by the miner, for which the master was not liable. (Page 195.)

2. SAME—PRESUMPTION OF NEGLIGENCE.—Where electric wires were properly insulated and strung a short while before the accident, and there was no reason to anticipate that they would become loose and cross each other, negligence of the master will not be presumed from the mere happening of the accident. (Page 196.)

Appeal from Logan Circuit Court; *Jeptha H. Evans,* Judge; reversed.

### STATEMENT BY THE COURT.

These actions were brought by the appellees to recover damages for injuries alleged to have been received by them at the hands of the appellant by reason of a powder explosion in one of its mines at Denning, Arkansas, known as Mine No. 2. The averments of ownership of the mine, operation of its system of electric wires and currents in the mine and negligence of the appellant in the operation and maintainance of the system of electricity in said mine are the same in each of the complaints, and all of the causes were consolidated and tried together. Verdicts for each of the appellees were returned by the jury, aggregating $750.

The complaints, after alleging the ownership by appellant of the mine in which the explosion occurred, the operation by it of a system of electric wires therein, the employment of appellees, the discharge by them of their respective duties and the exercise of ordinary care by them, at the time of the accident, for their own protection, and the nature of the injuries received, charge negligence as follows:

That it allowed and permitted a large amount of powder to be stored in said entry under and near the said electric wires. That it allowed and permitted the insulation on said wires to become loose, peeled and skinned off, rotten and decayed so that when said wires came together they would form a short circuit and by reason of the electricity burn into and fall to the ground or bottom of said entry. That it allowed and permitted the said wires to become too loose, and that by reason of becoming too loose they were easily and readily caused to come in contact and form a short circuit as aforesaid. * * * That on the said 26th day of March, 1906, the said wires, by reason of said condition, did come in contact with each other and formed said short circuit, and one of said wires was burned in two and thereby caused to fall in and upon one of the kegs in which said powder was contained, thereby coming in contact with said powder with a spark of electricity from said wire, and thereby causing the powder to explode and produce the burns and injuries of plaintiff as herein complained of."

The answer of defendant specifically denied each allegation of the complaint, and, in addition, pleaded contributory negligence, assumed risk, and that plaintiffs, when injured, were at a place where they had no right to be, and were not injured while in their lines of duty.

The evidence on behalf of appellees tended to prove that the injury to them was caused by the burning of electric wires over a can of powder around and about which appellees were gathered, that the wires were crossed, making a short circuit causing them to burn, part, and fall to the can of powder beneath, that the explosion was caused by the sparks from the burning electric wires igniting grains of powder that were about the can, or else the end of the wire charged with a current of electricity, coming in contact with the can, burned a hole through same and thus ignited the powder. One of the witnesses for the appellees, describing the accident, said: "I saw the wires burning in two. I saw the sparkling, and took it for that. I did not see the wires fall, but I saw it afterwards. I did not see it down till after the explosion. They were all right until this wire burned in two. The sparkling I saw was on the ground after the wire fell. I was sitting facing the west, and the wire was out to one side, and I heard this sparkling, and as I turned my eyes and saw this sparkling; then it went up. * * * I know the wire that was burned in two was the main current wire. * * * When the wire burned in two, I saw sparkles of fire. Then I heard a frying noise, like it was in a barrel. These frying noises lasted a few seconds. It was a very few minutes after the frying noise that the explosion took place." This witness further testified in part as follows:

"I know enough about electricity to tell what it takes to constitute a short circuit. I helped run the motor for 14 months. That gave me some knowledge of the nature of electricity. If a wire or anything would burn or fall on anything wet or damp, that would make a short circuit. A wire charged with electricity, if it comes on the ground, you can tell that it is a live wire by the sparkling and fire that it throws. Wire insulated like this would cause a short circuit if it came in contact with the wall, if the wall was damp, and this wall was damp. The roof was sweating very bad, and if this wire was

charged with 260 volts it would burn right in two and fall to the ground. * * * I do not know about how much voltage was on that day, but I have been on top and looked at the voltage register, and it showed 260. * * * I know if a cold wire and a hot one cross, if it was not insulated heavy enough, it would cause a short circuit. If the wire had been insulated heavy enough, it would not have short circuited. What I mean by insulation is a substance that keeps it from making ground connection."

Another witness for appellee testified in part as follows:

"I was right by the keg of powder when the explosion took place. I saw the keg of powder. I had been sitting on it. That was before the lights came on. The lights came on, and the explosion took place all in the same moment. I first noticed sparklings up towards the roof. They were kind of sparks of fire. The explosion took place at the same instant I saw this fire in the roof."

Another witness for appellee testified: "I was running the electric locomotive that hauls the coal. Had been operating it about four years. The dynamo is supposed to carry 250 volts. If a wire that is carrying a current of 250 volts is grounded, or forms a short circuit, if it hits a piece of iron, it will burn it. I have been foreman of the light and power house at Fort Smith. Worked there one year. My work has given me experience with wires that were charged with electricity. If a wire charged with a current of electricity should fall upon an iron keg sitting upon the ground, it would burn the keg as long as the wire would last. Those powder kegs were made of sheet iron. If the wires they were using for lights were to fall on an iron keg, I think it would have the effect to burn a hole in the keg. It would either burn a hole in the keg or burn in two. If the wire were short circuited, it would explode the powder."

On behalf of the appellees it was shown that it was the duty of the pit boss to look after the powder and to remove it, if it was necessary for it to be removed; that complaint was made to him during the week or ten days that the can of powder was there, to remove it; that he said he would move it, and for the men to go on to work.

One witness, speaking to this point, said: "I went to see Mr. Hogan several different times about some powder in that entry. I went to him off and on for about a month. I went to him because there was danger in the way they handled the powder, and he promised to move the powder, and I told the men he had promised to move it. I spoke to Mr. Hogan about it on Thursday before the explosion tok place, and he said he would have it remedied." On cross-examination, this witness testified: "The powder had to be unloaded at some point for distribution, and the junction point was made the point of distribution ever since I have been there—three years. The powder I am talking about was cans of powder. They distributed it from that point, but they left it there under the wires." On re-cross examination, this witness testified: "I was complaining because I did not want any powder left there. Powder has been distributed at this point for the last three years. I first saw Pierce, and then I found Hogan and asked him to move it."

On behalf of appellant there was evidence which showed that the wires were fastened to a block in the rib. The wires were five or six inches apart, and kept apart by wooden cleats. A witness who assisted in putting up the wires testified as follows: "Blocks were put in between the wires, so that they could not come together. Was down there three or four times after they were put up and found them in the same condition, and know of nothing wrong with them before the explosion. We got a wire which was insulated with a non-conductor, that looks to me like silk or cotton, from the machine shop, off of a spool, and Mr. Pierce and I put it up. The wire shown in court was the kind of wire used." This witness further testified: "If a wire was non-insulated, and fell to the ground, that would make a circuit. If it came in contact with the earth at a point where it was insulated, it would create a short circuit; it would make a spark. Never tried it to see if a spark would set powder on fire. To burn a can of powder, you would have to get both the positive and negative wire on the can. If the ground is damp, and the can sitting on the damp ground, it would create a short circuit; and if you put the wire on the ground, the can would carry the current into the ground. Never tried to see if it would burn the can."

The evidence on behalf of appellant is uncontradicted that the wires when put up were properly separated from each other by wooden cleats. When first erected, they were so constructed that they could not come in contact with each other.

There was evidence on behalf of appellant that tended to show that the powder can could not have been burned into by the wire, even if it had been burned in two and had fallen to the ground as described by the witnesses for appellee, and the evidence for the appellant also was to the effect that a wire, insulated as the wires were shown by it to have been, could not have burned in two without destroying more of the insulating material or fibre than was shown to have been destroyed on the wire exhibited. The evidence, both by the witnesses for the appellees and the appellant, showed that the parties congregated about the powder can had open lamps, and several were smoking at the time of the accident.

In rebuttal, appellees showed that before the explosion the wires could touch the coal between the blocks of wood by which they were separated.

*Ira D. Oglesby,* for appellant.

*Sam R. Chew,* for appellees.

WOOD, J., (after stating the facts.)    It is not shown that the appellant was negligent in the matter of placing the powder for distribution to the employees in the mine. It "had to be unloaded at some point for distribution, and the junction point had been made the point of distribution for three years." Presumably, this was selected as the distributing point because it was regarded at the most suitable and convenient location. It is not shown that there was any danger to the employees by reason of the place where the powder was stored or kept. The danger, if any, was in the way the powder was handled. But if there was danger to the operatives by reason of the powder being located for distribution at the point designated, it was a palpable risk or danger which they assumed, when they congregated about it. If there was danger in the place of storing, it was such a danger as no employee would be warranted in assuming for one moment, even under a promise of the master to remedy or discontinue. If we should concede that there might have been

danger in connection with the location of the powder, it was a danger absolutely necessary to the business, and one that the employees assumed when they entered upon the employment. The evidence does not warrant a finding of negligence against the appellant "in permitting a large amount of powder to be stored in the entry under and near the electric wires," as charged in the complaint.

There was no danger of an explosion being produced by the electric wires coming in contact with the powder, provided the wires were properly erected and insulated. So the proximate cause of the injury complained of in this case, if it resulted in the manner set up in the complaint, was by the crossing of the electric wires, and the actionable negligence, if any, was in not properly erecting the wires. But in our opinion the evidence fails to show a cause of action in this particular. This is not a case where the doctrine of *res ipsa loquitur* applies. The proof affirmatively shows without contradiction that the wires were properly separated when erected, and that there was no reason to contemplate that they could become crossed in so short a time after they were erected. A sufficient time had not elapsed for the decay of the cleats or blocks that separated the wires. There was no reason to anticipate that they should become loose and cross each other in the time intervening their erection and the accident. They were shown to be in perfect order but a short while before the accident. The appellees do not show that the wires were in such condition before the accident that the exercise of ordinary care in their inspection would have discovered any defect. *Mammoth Vein Coal Co.* v. *Looper, post* p. 217.

Negligence can not be presumed, under the facts shown here, from the mere happening of the accident. *St. Louis, I. M. & S. Ry. Co.* v. *Andrews*, 79 Ark. 439; *St. Louis & S. F. Rd. Co.* v. *Wells*, 82 Ark. 372, and cases cited.

The proof does not disclose that in the usual course the accident could not have happened but for appellant's negligence. On the contrary, the evidence shows that men were gathered about the powder can smoking, and that this was not an unusual occurrence. That undisputed fact itself furnishes

a most reasonable explanation of how the accident might have happened, aside from any negligence of appellant.

So we are of opinion, upon the whole record, that there is no evidence to sustain the verdict. The judgment is therefore reversed, and the cause remanded for new trial.